## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-10993 |
| | ) | |
| Universal Rehab Services, Inc., | ) | Hon. Victoria A. Roberts |
| PhysioFlex, PLLC, | ) | |
| Ahmad T. Abulabon, P.T., | ) | |
| Summit Medical Group, PLLC, and, | ) | |
| David Jankowski, D.O, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

---

MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
By:  Thomas W. Cranmer (P25252)
Attorneys for Plaintiff
840 W. Long Lake Road, Suite 200
Troy, MI 48098
(248) 267-3381
cramer@millercanfield.com
allen@millercanfield.com

KATTEN MUCHIN ROSENMAN, LLP
By:  Ross O. Silverman (IL 6226560)
Kathy P. Josephson
Attorneys for Plaintiffs
525 West Monroe Street
Chicago IL 60611-3693
(312)902-5200
Ross.silverman@kattenlaw.com
Kathy.josephson@kattenlaw.com

SEIKALY STEWART & BENNETT, PC.
By: Larry W. Bennett (P26294)
Attorneys for Universal Rehab Services, Inc., Physioflex, Pllc, and Ahmad T. Abulabon P.T.
30445 Northwestern Hwy., Suite 250
Farmington Hills, MI 48334
(248) 785-0102
lbennett@sslawpc.com

JOELSON ROSENBERG, PLC
By:  David W. Warren (P32449)
Peter W. Joelson (P51468)
Co-Attorneys for Defendants Summit Medical Group PLLC and David Jankowski, D.O.
30665 Northwestern Highway, Ste. 200
Farmington Hills, MI 48334
(248) 626-9966
dwwarren@joelsonrosenberg.com
pjoelson@joelsonrosenberg.com

GARY R. BLUMBERG, PC
By:  Gary R. Blumberg (P29820)
Co-Attorneys for Defendants Summit Medical Group PLLC and David Jankowski, D.O
15011 Michigan Ave.
Dearborn, MI 48126
(313) 230-1121
grblumberg@gmail.com

---

<u>**DEFENDANT SUMMIT MEDICAL GROUP, PLLC'S**</u>
<u>**COUNTERCLAIM AND JURY DEMAND**</u>

NOW COMES, Counter-Plaintiff, SUMMIT MEDICAL GROUP, PLLC, (hereinafter referred to as "Summit"), represented by the above counsel, and for its Counterclaim against Counter-Defendant, State Farm Mutual Automobile Insurance Company, (hereinafter "State Farm") states as follows:

## INTRODUCTORY STATEMENT

This Counterclaim is intended to expose State Farm's illegal, fraudulent and unlawful claims handling processes spearheaded by Patricia Parr-Armelagos, State Farm's Michigan task force commander, which are utilized, with specific intent and in conjunction with Court system, to subvert the Michigan No-Fault Act by extorting agreements preventing healthcare providers such as Summit Medical Group, PLLC, from submitting any claims to State Farm for treatment of State Farm insureds.

## NATURE OF THE ACTION

1.      Counter-Plaintiff Summit brings this action seeking redress for the illegal acts of Counter-Defendant State Farm and its accomplices and co-conspirators, which have resulted in a loss of Summit's property and a detriment to Summit 's business, and for declaratory and injunctive relief to end those practices and prevent further losses.

2.      This Counterclaim is based on the relationship State Farm has with healthcare providers, such as Summit, rather than on the relationship between State Farm and its insureds.

3.      However, Counter-Plaintiff Summit is also motivated by its belief that State Farm's scheme is harmful to the health of its patients and to the welfare of the people of the State of Michigan.  By taking funds that have been rightfully earned by healthcare providers and diverting them to their own use, State Farm and its co-conspirators deprive healthcare providers of the adequate and timely payments they need to treat patients and maintain their practices.

2

4.      As further described below, the premise of the relationship between State Farm and the healthcare providers that treat its insureds is that the healthcare providers will be paid, in a timely manner and in accordance with the Michigan No-Fault Act, being MCL § 3101, *et seq.*, for the medically necessary services they render.

5.      State Farm, on its own and as part of a common scheme with its accomplices and co-conspirators, utilized an unlawful pattern of processing claims submitted by or through Summit to systematically deny, delay, and diminish the payments due to healthcare providers in violation of the Michigan No Fault Act, being MCL § 3101, *et seq.*.

6.      State Farm accomplishes this by utilizing an unlawful pattern of processing claims and covertly denying payments to healthcare providers, including Summit, based on which healthcare provider or facility submitted the claim rather than on the reasonableness or necessity of the healthcare services provided to the insureds.

7.      This is an action whereby Summit seeks judicial redress against State Farm and State Farm's co-conspirators and accomplices in the form of declaratory relief, injunctive relief, damages, costs and attorney fees, as a result of State Farm, often acting on behalf of the State of Michigan through the "assigned claims facility" under the Michigan No-Fault Act, being MCL § 3101, *et seq.*, and in cahoots with "'Independent' Medical Examination" doctors ("IME Doctors") denying certain insurance claims and refusing payments regarding the same for impermissible, illegal, and unconscionable reasons.  These actions render State Farm, its IME doctors, and other co-conspirators liable for damages and other relief as set forth herein.

8.      The underlying factual basis for this Counterclaim results from the unsuccessful actions of State Farm, undertaken over a lengthy period of time, to legislatively, administratively, and judicially modify the existing coverage for "first party benefits" under the Michigan No-Fault Act, MCL § 500.3101 *et seq.* (sometimes, the "Act"), in order to reduce the medical payments that

they are required to make under the Act and to thereby maximize its profits.

9.      Notably, State Farm's efforts to influence legislation to reduce or limit the payment by insurers of "first party benefits" under the Act did not succeed.

10.     When such efforts failed, State Farm began utilized an unlawful pattern of processing claims submitted by or through Summit to systematically and fraudulently deny claims submitted by Summit under false pretexts as set forth below, forcing Summit and similarly situated health care providers to initiate litigation to collect the payment of "first party benefits," which should have been promptly paid pursuant to the Act.  As detailed below, the outcome of such actions shows that State Farm's blanket denial of all claims or certain medical procedures was fraudulent and done for an improper purpose.

11.     Summit further seeks both declaratory and injunctive relief against State Farm and its co-conspirators to have this Honorable Court enjoin the illegal and fraudulent claim handling procedures of State Farm and its co-conspirators, and to enjoin their engagement in the same.  In this regard, the relief requested by Summit not only extends to itself, but to other similarly situated licensed healthcare professionals, to their patients, and to the people of the State of Michigan. Persons injured in automobile accidents in this State are entitled to know that they are permitted to select properly licensed healthcare professionals of their own choice, and that such selection will not in any way deprive them of any rights or benefits that they may have under the Act.

12.     State Farm has even gone as far in resolutions with various healthcare professionals as demanding agreements from such individuals that those properly licensed healthcare professionals can no longer submit **ANY** claims to State Farm, even though their patients require such medical care, and are therefore entitled to first-party medical payments under the Act.

13.     State Farm illegal claim handling processes is utilized with specific intent to extort agreements which prevent healthcare providers such as Summit from submitting any claims to

State Farm for treatment of State Farm insureds.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

15.    Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b) and (c), as the various acts complained of occurred and Summit operates within the Eastern District of Michigan.

## PARTIES

16.    Counter-Plaintiff Summit Medical Group, PLLC, ("Summit") is a Michigan professional limited liability company engaged in the business of providing medical, therapeutic, and rehabilitative services, and conducts business in Dearborn, Wayne County, Michigan. Dr. David Jankowski, D.O. is Summit's sole shareholder.  Dr. Jankowski is a board-certified osteopath and specializes in anesthesiology.

17.    Counter-Defendant State Farm is incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed by the State of Michigan, and sells and provides within the State of Michigan, through its Michigan licensure and in particular within the Eastern District of Michigan, various insurance products, including automobile No-Fault insurance pursuant to the Act.

## GENERAL ALLEGATIONS

18.    Counter-Plaintiff Summit incorporates herein by reference each and every paragraph above as though fully set forth herein.

19.    Summit provides healthcare services to State Farm's insureds upon the fundamental premise that, if the services are reasonable necessary pursuant to MCL § 500.3107, and the insured is covered by a State Farm insurance policy, Summit will be compensated in a timely manner for providing those services.

20.     State Farm represents to healthcare providers, such as Summit, that it will pay healthcare providers in a timely manner for rendering medically necessary services pursuant to the Act to its insureds.  State Farm makes such representations in several ways, such as:

     a.  By providing to its insureds plans or policies stating that healthcare providers will be compensated for rendering covered, medically necessary services as defined in the Act.

     b.  By providing its insureds with insurance cards or other identification to show treating healthcare providers;

     c.  By confirming coverage for medically necessary services when contacted prior to treatment;

     d.  By providing billing information to healthcare providers;

     e.  By operating in Michigan, which requires timely payment pursuant to the Act.

### *The Michigan No-Fault Act*

21.     Pursuant to MCL § 500.3105(1) of the Act, under personal protection insurance (hereinafter "PIP"), an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the other provisions of the Act.

22.     Pursuant to MCL § 500.3105(2) of the Act, PIP benefits are due under the Act without regard to fault.

23.     Pursuant to MCL § 500.3105(3) of the Act, bodily injury is accidental as to a person claiming PIP benefits unless suffered intentionally by the injured person or caused intentionally by the claimant.

24.     Pursuant to MCL § 500.3107(1)(a) of the Act, PIP benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation."

25.     Under the Act, and in particular pursuant to MCL § 500.3171 *et seq.*, the State of

Michigan has established an assigned claims facility for the purposes of assigning the administration and payment of PIP claims where:  No PIP is applicable to the injury; no PIP applicable to the injury can be identified; the PIP applicable to the injury cannot be ascertained because of a dispute between two or more automobile insurers concerning their obligation to provide coverage or the equitable distribution of the loss; or where the only identifiable PIP applicable to the injury is, because of financial inability of one or more insurers to fulfill their obligations, inadequate to provide benefits up to the maximum prescribed.

26.     Pursuant to MCL § 500.3171 *et seq.* and the regulations promulgated thereto found at R 11.101 to 11.116 of the Michigan Administrative Code (the "Regulations"), the Michigan Secretary of State is responsible for organizing and maintaining the Assigned Claims Facility and the assigned claims plan (the "Assigned Claims Plan") to be adopted and implemented through the Regulations.

27.     Pursuant to MCL § 500.3174, the Assigned Claims Facility shall, upon the filing of a claim to it, assign the claim to an insurer in accordance with the Assigned Claims Plan and notify the claimant of the identity and address of the insurer to which the claim is assigned or of the facility if the claim is assigned to it.

28.     State Farm is an "Insurer" and a servicing insurer pursuant to the Assigned Claims Plan.

29.     Upon information and belief, with regard to a number of the claims submitted by Summit to State Farm for payment under the Act, State Farm was the insurer for such claims pursuant to assignment by the Assigned Claims Facility.

30.     Pursuant to MCL § 500.3175(1), an insurer to whom claims have been assigned through the Assigned Claims Facility shall make prompt payment of loss in accordance with the Act, and is thereupon entitled to reimbursement by the Assigned Claims Facility for the payments

and the established loss adjustment cost, together with certain statutory interest.

31.     Pursuant to R 11.103(1) of the Regulations, a servicing insurer to whom a claim has been assigned shall either deny the claim as being ineligible for benefits under the Assigned Claims Plan or make prompt payment of loss or other lawful disposition of the claim in accordance with the Act.

32.     Pursuant to R 11.109(1) of the Regulations, upon assignment of a claim from the Assigned Claims Facility, the servicing insurer shall investigate the claim expeditiously and make prompt payment for loss within the time prescribed in the Act.

33.     By failing to process, as required by the Act, "first party claims" received through the Assigned Claim Facility, State Farm, utilizing its fraudulent pre-planned claim processing protocol of blanket denials of claims and/or certain procedures, has artificially and wrongfully deprived Summit of reimbursement pursuant to the Act.

34.     After failed attempts to reduce the payment of "first party benefits" owed pursuant to the Act, State Farm commenced its predetermined pattern of claim processing procedure to wrongfully deny certain procedures en masse and sometimes the entire claim submitted through Summit for reimbursement under the Act, using State Farm's co-conspirators and accomplices to assist in denying or justifying the denial of claims.

35.     Such denials were made based upon a pre-planned protocol of claims-processing utilized by State Farm, the purpose of which was to indiscriminately and wrongfully avoid the payment of benefits and other obligations under the Act, including the payment of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation.

36.     Such pre-planned protocol of claim and procedure denials utilized some of the below fraudulent claim handling procedures:

a. "TIN Diversions": the process by which a healthcare provider is targeted by State Farm and any and all claims submitted by or through such healthcare provider based on the tax payer identification number of such healthcare provider are diverted to special task forces called the Special Claims Investigation Unit ("SCIU") or the Multiple Claim Investigation Unit ("MCIU") which then employ special claims handling procedures not tailored to the individual merits of the subject claim, but tailored solely and specifically to justify a denial of such claim;

b. "TIN Stop": the process, similar to a TIN Diversion, by which State Farm targets a healthcare provider and denies any and all claims submitted by or through such healthcare provider based on the tax payer identification number of such health care provider which submitted the claim and not based on the individual merits of the subject claim;

c. "Project": the internal code-name referred to by State Farm adjusters after State Farm targets a healthcare provider for investigation to falsely justify the denial of all claims or certain procedures submitted by such health care provider.

d. "Cut-off Doctors": the term commonly used by State Farm referring to the doctors employed by State Farm to conduct purported "independent" medical exams as a pre-text to support State Farm's improper denial of a claim. Specifically, "Cut-off Doctors" are hand-selected doctors who provide predetermined and pre-planned reports, which are then falsely represented as "independent" to buttress State Farm's wrongful denials of claims submitted by health care providers.

37.     As a result of the wrongful, fraudulent, bad faith, and tortious behavior of State Farm and its co-conspirators and accomplices, including the "Cut-off Doctors", Summit was forced to initiate litigation in order to obtain the payment of benefits that were otherwise legally payable under the Act.

38.     A representative of State Farm, Michael Flannery, admitted to utilizing these illegal claims handling procedures, specifically with respect to Summit and Dr. Jankowski.

39.     In the excerpt of Mr. Flannery's testimony below, Mr. Flannery is testifying

regarding four payments for treatment that he personally approved and determined to be reasonable

and necessary and otherwise in compliance with the requirements for payment by State Farm, but

that those payments were not issued because of a TIN stop:

Q.    He did not -- let's make this clear, by the way, in
      order to issue the payment that you wanted to pay,
      that you recommended for those four dates of service,
      you had to get permission to lift that SIU TIN block,
      didn't you?

A.    Well, it was in litigation and I have to -- you know,
      if there was a TIN block in at the time, I made my
      recommendation irrespective of the TIN block.  If it
      had to be lifted to make the payment, yes, that would
      have had to be done, but I still had to send my file
      note to him so he can --

Q.    I understood.  But I want the jury to understand the
      mechanism, litigation or no litigation --

A.    Right.

Q.    -- when you made the recommendation to issue these
      four payments, they could not be lifted without the

TIN block being lifted, isn't that true?

A.    Correct.

Q.    And the only ones who could have lifted that TIN
      block are either Mr. Eikins (phonetic), your boss or
      Mr. Eikins' boss Ms. Armelagos, is that right?

A.    Well, they contact finance to lift the TIN block,
      yes.

Q.    Right.  And if they don't to that it doesn't get paid
      even though you recommend it, correct?

A.    Correct.

Q.    And if they don't do that it doesn't get paid even
      though it's reasonable and necessary for the care,
      recovery and rehabilitation of that patient, is that
      right?

A.    They have to recommend lifting of the TIN block.

Q.    Okay.  Now, will you confirm for me with this jury
      that between the time you recommended payment on June
      11, 2013 and the time your boss Mr. Eikins made a
      file note per our discussion, meaning he talked it
      over with you, correct?

A.    Yes.

Q.    Will you confirm for this jury that there is no
      reference in your activity log of any additional
      information being obtained between those dates?

A.    There's nothing here, no.

40.     Another State Farm employee, Dawn Mills, admitted under oath that Summit was the subject of a TIN stop by the Special Investigations Unit ("SIU"):

```
                        Let's start with, you said there was a SIU

        TIN block in this file, correct?
A.      Correct.
Q.      But you said you could pay, right?
A.      Yes.
Q.      But you didn't pay?
A.      That is correct.
Q.      And you didn't pay anything other than the EMS bill?
A.      That is correct.
```

41.     For instance, a patient identified as "MF" sought treatment from Summit (and other healthcare providers) for injuries sustained in a motor vehicle accident—however, State Farm denied payment for all treatment provided to patient MF other than the EMS Bill.

42.     This particular claim for patient "MF" was tried to a verdict in the Wayne County Circuit Court, Case No. 2012-016021-NF, in which the jury awarded payment to Summit for treatment provided to MF (Exhibit A, Jury Verdict Form in Case No. 2012-016021-NF) and the Court ordered that State Farm pay Summit's attorneys fees pursuant to MCL § 500.3148(1). (Exhibit B, Order Regarding Motions in Case No. 2012-016021-NF).

43.     The litigation for patient MF is emblematic of the manner in which State Farm uses an unlawful claims handling process to avoid payment of No-Fault benefits.

44.     Amazingly, State Farm has refused to pay No-Fault benefits for patient MF even after the jury trial verdict (Exhibit C, Explanation of Review for unpaid bill for patient MF).

45.     During such litigations, State Farm, also in violation of the Act, retained "Cut-off

Doctors" as purported "independent" medical doctors, such as Dr. Paul J. Drouillard, D.O., Dr. Stanley Lee, D.O., Dr. Steve N. Geiringer, M.D., Dr. Philip Mayer, M.D., Joseph P. Feminineo, M.D., Scott Monson, M.D., Dr. Alex Steinbock, D.O., Dr. Saul Foreman, M.D., and Dr. L. Patrick Stephens, M.D., and through certain IME companies, including Exam Works, Evaluations Plus, Medical Evaluation Services Solutions ("MES Solutions"), and Medicolegal Services, all of whom claimed to be "independent," as accomplices to provide form/predetermined denials to further justify State Farm's wrongful claim processing procedures refusal to pay benefits lawfully owed under the Act.   An individual with knowledge of State Farm's fraudulent claims-handling procedures, including its relationship with "Cut Off Doctors" testified in a first-party no fault litigation about the existence and State Farm's utilization of such "Cut Off Doctors":

```
2   Q.   And then when you say the insurance carriers were
3        looking for specific doctors you called them cutoff
4        doctors?
5   A.   Yes.
6   Q.   What do you mean by that?
7   A.   They're the doctors that are going to give you the
8        report that you're looking for saying they can
9        return back to work or, you know, that they're fine.
```

```
10   Q.   And then who are -- was there a list of doctors that

11        were indicated as cutoff doctors?

12   A.   It's something that we knew from the, you know,

13        years of experience who the doctors were.

14   Q.   Who are those doctors?

15   A.   Drouillard's on the list.  Munson, Steinbock.

16   Q.   Doctor Lee?

17   A.   Femminineo.

18   Q.   How about Doctor Lee?

19   A.   Obianwu, Stanley Lee.

20   Q.   Anyone else?

21   A.   Sal Foreman.

22   Q.   Anyone else?

23   A.   Stevens.

24   Q.   L. Patrick Stevens?

25   A.   Yes.
```

46.    Rather than conducting accurate evaluations of each patient, State Farm's IME accomplices routinely and systematically utilize a predetermined, unlawful protocol to "examine" the insured and generate a form report to improperly deny the payment of allowable expenses and reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation.

47.    State Farm also utilized certain parties currently unknown to Summit as accomplices to provide hypothetical "paid opinions" to justify the wrongful acts of State Farm and its co-conspirators and accomplices, and to avoid the payment of proper claims submitted under

the Act.

48.     Upon information and belief, the utilization of such paid accomplices, including IMEs, was wrongful and done for the sole purpose of avoiding the payment of benefits due and owing under the Act.

49.     Pursuant to State Farm's predetermined unlawful claim-processing protocols and procedures used to reject certain claims submitted by Summit, State Farm routinely denies the entire claim simply because Summit Medical Group, PLLC, or Dr. Jankowski appear on the bill or list of care providers for a particular patient.  State Farm then pays IME doctors and other accomplices to support the wrongful denials.

50.     State Farm has subverted the express provisions of the Act requiring State Farm and similarly situated insurers to pay "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those expenses are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle.  MCL §§ 500.3105 and 3107(1)(a).

51.     Despite the express provisions of MCL §§ 500.3107(1)(a) and 500.3142, State Farm intentionally failed to follow the claim processing protocol for reviewing and authorizing the payment of No-Fault PIP benefits and instead instituted fraudulent claim handling procedures as set forth above.

52.     State Farm and its co-conspirators and accomplices knew or should have known that the wrongful denials of claims by use of the predetermined and unlawful claim processing protocol for claims submitted by Summit were made intentionally, tortiously, negligently, and/or recklessly with knowledge of their falsity in view of the actual state of affairs, and said promises and representations were made with the then present intention of not performing said promises and

representations.

53.     As a direct and proximate result of the wrongful actions of State Farm and its co-conspirators and accomplices as stated above, Summit has suffered and will continue to suffer damages and economic losses as more detailed below.

### State Farm's Unlawful and Fraudulent Scheme

54.     Though it is paramount to the relationship between the healthcare provider and State Farm, and is necessary to prevent healthcare providers from being misled by State Farm's apparent actions and statements, State Farm concealed the fact that its predetermined protocol described herein will be used to delay, deny, and diminish payment for covered, reasonable and necessary services.

55.     After providing healthcare services to a State Farm insured who was injured in an automobile accident, Summit is required to submit a standard coded claim form to State Farm.

56.     Summit, and other healthcare providers, rely on State Farm's express and implied representations that it will review each claim pursuant to the Act and then pay Summit and other healthcare providers for rendering covered, medically necessary services by providing those services, and then requesting payment from State Farm in the manner required by State Farm, rather than billing the patients directly.

57.     State Farm and its co-conspirators and accomplices engage in a common fraudulent scheme designed to automatically and systematically utilize its unlawful predetermined claim processing procedure to deny, delay, and diminish payments to Summit using the protocols and techniques described herein with the goal of pressuring health care providers to enter into agreements which prohibit the provider from every again submitting any claim for treating State Farm insureds under the Act.   Summit and countless other healthcare providers have been victimized by this scheme.

### *Improper Denial of Payment Requests*

58.     State Farm secretly does not use the standard described in MCL § 500.3107 as criteria for evaluating payment requests.  Instead, State Farm employs its fraudulent claims handling protocols such as TIN Diversions, TIN Stops, Projects, and Cut-off Doctors and automatically denies certain claims submitted by Summit simply because the claims were submitted by Summit, and without any inquiry into the specific claim and, specifically, without any inquiry into the claims medical necessity or other standards prescribed by the Act.

### *Improperly Delaying Payment*

59.     State Farm not only systematically denies claims submitted by Summit, it also intentionally and improperly delays payments.

60.     As part of its unlawful claim processing procedure, State Farm improperly delays payments by sending to Summit a letter in which State Farm notifies Summit that it "has not yet made a determination of its obligation to pay" and that the matter is "presently under investigation," assuring Summit that it will be notified "as soon as a determination has been made."  (See Exhibit D, "Investigation Letters" for patient RD).

61.     These form "investigation letters" are sent immediately after receiving a claim for payment of benefits from Summit, and at other various stages of the claim process, which letters contain false and misleading information and statements as to the propriety of the charges sought to be paid to Summit.

62.     The purpose of the "investigation letters" is to delay or preclude the payment of benefits due and owing under the Act and to serve as a predicate for the later wrongful denial of the payment of benefits due and owing under the Act.

63.     Subsequent to the issuance of the purported "investigation letters," State Farm again issues form, predetermined explanation of benefit ("EOB") letters, which contain false and

misleading information and statements as to the propriety of the charges sought to be paid to Summit, to fraudulently deny the payment of benefits due and owing under the Act. (See Exhibit E, "EOBs" for patient RD).

64.     The wrongful denial of benefits through the pattern of wrongful, fraudulent, bad faith, grossly negligent, and malicious claim processing procedure of State Farm and its co-conspirators, to facilitate the issuance of the above "investigation letters" and EOB letters, forced Summit to either seek judicial relief for the payment of benefits which would otherwise be conferred under the Act and Michigan law or lose the payment of such benefits by operation of law.

65.     State Farm demanded that patient RD be examined by Dr. Steven Geiringer, who has conducted hundreds of examinations on behalf of State Farm. (Exhibit F, October 25, 2010 Report from Dr. Geiringer for patient RD).

66.     In his report of October 25, 2010, Dr. Geiringer acknowledged that a motor vehicle accident occurred.

67.     In his report of October 25, 2010, Dr. Geiringer acknowledged that patient RD's injuries could have been caused by the motor vehicle accident.

68.     However, Dr. Geiringer concluded that the physical therapy treatment provided to RD "would not be warranted." (Exhibit F)

69.     Dr. Geiringer made this determination without reading the patient's file. (Exhibit F).

70.      Dr. Geiringer issued another report (Exhibit G, October 27, 2010 Report from Dr. Geiringer for patient RD), and came to the same conclusion that the treatment provided to RD was not appropriate.

71.     State Farm used Dr. Geiringer's reports to justify denying payment to Summit for

18

RD's treatment.

72.    In fact, State Farm did not pay any of the bills submitted by Summit for patient RD.

73.    State Farm first notified Summit that it was refusing to pay on January 24, 2011, through form "Explanation of Benefits" letter.  (Exhibit E, EOBs for patient RD).

74.    State Farm based its decision to deny payment for any of the treatment provided to RD upon its own claim file and the report by Dr. Geiringer.  (Exhibit H, Denial Letter for patient RD, January 21, 2011).

75.    Specifically, State Farm based its decision to deny payment solely on Dr. Geiringer's report of October 25, 2010, in which Dr. Geiringer didn't review any of the patient's records.

76.    Dr. Geiringer requested additional records from State Farm (see Exhibit G), specifically MRI records for the patient RD.

77.    There is no evidence that State Farm provided those records or that they were considered by Dr. Geiringer in his report or opinion.

78.    State Farm was aware that its co-conspirator, Dr. Geiringer, was conducting the examination because State Farm wrote a request for the examination to Dr. Geiringer specifically. (Exhibit I, Letter to Evaluations Plus/Dr. Geiringer).

79.    The above predetermined pattern of claim processing procedures including, without limitation, State Farm's use of fraudulent claims handling protocols such as TIN Diversions, TIN Stops, Projects, and Cut-off Doctors, and then issuing various written correspondence such as Investigation letters and EOBs informing that the claims submitted through Summit were under "investigation" was a plan, policy, and pattern of activity by State Farm and its co-conspirators to attempt to intentionally circumvent the provisions of the Act with the goal of pressuring health care providers to enter into agreements which prohibit the provider from every again submitting

any claim for treating State Farm insureds.

80.     State Farm routinely sends an investigation letter to Summit shortly after receiving a claim from Summit.  For instance, in the case of patient RD, State Farm sent an "investigation letter" on November 5, 2010, after it received a claim from Summit for services provided on October 5, 2010.  State Farm sent several other identical letters to Summit for this patient: (See Exhibit D, "Investigation Letters" for patient RD).

81.     In these letters, State Farm makes material, false representations to Summit:

    a.     That the matter "is presently under investigation," when State Farm has no intention of doing anything to investigate the claim; and

    b.     That State Farm will notify Summit "when a determination has been made," when State Farm has already denied the claim but is delaying informing Summit.

82.     In the case of a patient identified as RD, State Farm sent at least one "investigation letter" on January 19, 2011, (Exhibit D), more than one year after the motor vehicle accident occurred, that contained two material, false representations to Summit:

    a.     That the matter "is presently under investigation," when State Farm has no intention of doing anything to investigate the claim; and

    b.     That State Farm "has not yet made a determination of its obligation to pay," when it has already decided to deny the claim.

83.     The truth is that by the time State Farm has sent the letter, it has already "made a determination of its obligation to pay," and has decided to deny payment on or even before the date the investigation letter is mailed.

84.     The truth is that the matter is not "presently under investigation" because State Farm does nothing even remotely appreciable to investigate the matter.

85.     The result is that payments are delayed well beyond the amount of time required by the Act, as well as the time set by industry practice.  This allows State Farm a significant float and increased access to funds, which State Farm is using to persecute healthcare providers, for

example, by filing RICO claims against them with the ultimate goal of pressuring health care providers to enter into agreements which prohibit the provider from every again submitting any claim for treating State Farm insureds. This also wrongfully deprives Summit of the value of its money, as well as the practical ability to treat patients injured in automobile accidents.

### Explanation of Benefits and Fraudulent Concealment

86.    After Summit's payment requests have been improperly denied and/or delayed, State Farm provides Summit with an explanation of benefits ("EOB").

87.    Exhibit E, the EOBs for patient RD, show that State Farm denied all claims submitted by Summit for patient RD citing "SF450: The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the requirements of MCL 3105." (Exhibit E).

88.    Explanation Code SF450 is cited for every treatment Summit rendered to patient RD.

89.    State Farm's c o-conspirator even acknowledged that RD's injuries were sustained in the motor vehicle accident, but still concluded that the treatment provided to RD was "not warranted."

90.    State Farm also conceals the manner in which it actually processes requests for payment by refusing to disclose its procedures and by depriving Summit of information that might enable it to discover State Farm's processing techniques.

### Coercive Use of Economic Power

91.    In order to perpetrate its scheme and continue to collect No-Fault insurance premiums from unsuspecting insureds while working towards its end-goal of effectively eliminating insureds' ability to obtain healthcare services from any healthcare provider in Michigan, State Farm uses its overwhelming economic power to coerce Summit and other

healthcare providers, at the risk of being "black-listed" or slapped with a RICO lawsuit, into providing care under State Farm's policies and practices without receiving fair or timely payment.

92.    State Farm uses its considerable economic means to hire its own healthcare professionals (referred to as "Cutoff Doctors") to conduct "independent" evaluations of Summit's payment requests.  These "independent" medical evaluations ("IME") are part and parcel of State Farm's scheme to limit or eliminate No-Fault benefits in Michigan. (See ¶36).

93.    State Farm's IME co-conspirators are as culpable as State Farm in the scheme to subvert the Michigan No-Fault Act because the IME co-conspirators purport to provide "independent" justification for State Farm's wrongful denial of claims without properly evaluating the claims based on MCL § 500.3107, and sometimes without ever even seeing the injured person.

94.    State Farm's extortionate conduct is made more effective by, and enforced through, the conspiracy described herein, as well as the co-conspirators' efforts to aid and abet each other in wrongfully confiscating or withholding Summit's property.

### *Conspiracy*

95.    State Farm has not undertaken these unlawful claim processing practices alone—it has done so as part of a common scheme and conspiracy, which includes State Farm, its IME doctors ("Cut-Off Doctors"), IME companies such as Exam Works, Evaluations Plus, MES Solutions, and Medicolegal Services, and their local subsidiaries and affiliates.

96.    State Farm and its co-conspirators, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to participate in the conspiracy, agreed to commit acts of fraud to deprive Summit of its rightful compensation, and actually committed such acts.

### *The Need for Declaratory and Injunctive Relief*

97.    State Farm's unlawful claims-processing scheme to deny, delay, and diminish payments to healthcare providers who treat its insureds is an ongoing problem that will continue

to cause Summit economic losses and threaten Summit's ability to provide healthcare services to the public.

98.     A money judgment in this case will only compensate Summit for past losses.  It will not stop State Farm's unlawful interference in healthcare treatment decisions, and it will not stop State Farm from continuing to confiscate the money Summit earns, which is necessary for Summit to maintain its practice.

### COUNT I –FRAUD/FRAUDULENT MISREPRESENTATION

99.     Counter-Plaintiff Summit incorporates herein by reference each and every paragraph above as though fully set forth herein.

100.    State Farm made material representations to Summit related to Summit's claims submitted to State Farm.

101.    State Farm represented to Summit that State Farm had not yet made a determination regarding its obligation to pay certain claims.  (See Exhibit D).

102.    State Farm represented to Summit that State Farm was conducting an investigation regarding certain claims.  (Exhibits D).

103.     State Farm made these representations repeatedly in the form of the letters described herein and attached hereto as Exhibit D.

104.    State Farm represented to Summit that it was denying payment of claims submitted by Summit because "[t]he injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the requirements of MCL 3105."  (Exhibit E).

105.    State Farm, in fact, denied payment because Summit and/or Dr. Jankowski were under investigation by State Farm, not because State Farm had actually examined the file and determined that the treatment provided by Summit was "not reasonable and necessary."

106.    State Farm refused payment based upon "SF450" even though their expert

acknowledged that patient RD's injuries were the result of a motor vehicle accident.

107.    State Farm's representations were false when they were made.

108.    On or before the date the Investigation Letters were mailed to Summit, State Farm had, in fact, "made a determination" regarding the claims submitted by Summit; in fact, State Farm had decided to DENY said claims.  State Farm's representation that it had not yet "made a determination" regarding the claims was therefore false when made.

109.    State Farm's representation that certain claims were "under investigation" was also false when made, because State Farm did not conduct any investigation regarding the claim itself; at most, State Farm may have consulted with its attorneys relative to the development of a litigation defense of such claim rather than investigating the individual merits of such claim as required under the Act.

110.    State Farm's representation that certain claims were denied because the services provided were not reasonable necessary was false when made because State Farm actually denied payment because of a Project, TIN Diversion, or TIN Stop for Summit.

111.    State Farm knew that its representations were false when they were made.

112.    State Farm knew that it had "made a determination" regarding certain claims submitted by Summit, and that it had already decided to DENY those claims on or before the date State Farm sent the fraudulent letter to Summit.

113.    On information and belief, one or more of the claims for which State Farm issued a letter had already been subject to a Project or TIN Stop or TIN Diversion, meaning that State Farm, using its own fraudulent protocol, had DENIED the claim before the letter was sent to Summit.

114.    State Farm is certainly aware of its internal "investigation" procedures, or lack thereof, and was aware that it had not actually begun investigating the claims submitted by

Summit, had no intention of investigating the claims, and in fact did not investigate the claims.

115.    State Farm made these fraudulent statements to Summit to induce Summit to forego or delay legal action against State Farm to collect payment.

116.    State Farm made these fraudulent statements to Summit to induce Summit to continue to treat State Farm insureds, without intending to pay Summit for such treatment.

117.    Summit relied on State Farm's fraudulent statements by delaying or foregoing legal action against State Farm to collect payment.

118.    Summit relied on State Farm's fraudulent statements by continuing to provide treatment and services to State Farm insureds.

119.    Summit relied on State Farm's fraudulent statements by continuing to provide treatment and services to State Farm insureds and submitting claims for payment to State Farm, rather than to the patients directly.

120.    Due to State Farm's secretive internal procedures and refusal to disclose its claims-handling processes and practices, there was no reasonable way for Summit to discover that State Farm had made a determination regarding certain claims, although State Farm represented to Summit that it had not yet made a determination on its obligation to pay.

121.    Due to State Farm's secretive internal procedures and refusal to disclose its claims-handling processes and practices, there was no reasonable way for Summit to discover that State Farm was not investigating certain claims, although State Farm represented to Summit that it was investigating the claims.

122.    Summit suffered monetary damages as a direct and proximate result of State Farm's fraudulent representations and Summit's reasonable reliance thereon.

## COUNT II – CIVIL CONSPIRACY

123.    Counter-Plaintiff Summit incorporates herein by reference each and every

paragraph above as though fully set forth herein.

124.    State Farm and its accomplices and co-conspirators, some of which are known to Summit and some of which are unknown to Summit at this time, acted in concert to commit fraud on Summit and violate the Michigan No Fault Act.

125.    State Farm routinely hires the same IME doctors, including Dr. Paul J. Drouillard, D.O., Dr. Stanley Lee, D.O., Dr. Steve N. Geiringer, M.D., Dr. Philip Mayer, M.D., Joseph P. Feminineo, M.D., Scott Monson, M.D., Dr. Alex Steinbock, D.O., Dr. Saul Foreman, M.D., and Dr. L. Patrick Stephens, M.D., and utilizes certain IME companies, including Exam Works, Evaluations Plus, MES Solutions, and Medicolegal Services, to conduct "independent" medical examinations to support State Farm's predetermined decision to deny claims submitted by Summit.

126.    On information and belief, these IME doctors are aware that they have been retained by State Farm to conduct a purported "independent" examination, and are aware that State Farm has already denied the claim or that State Farm intends to deny the claim.

127.    State Farm needs the form reports and opinions signed by the IME doctors to justify denying claims.

128.    State Farm routinely hires specific IME doctors ("Cut-off Doctors" see ¶36) with whom State Farm has an established relationship and who are willing to comply with State Farm's predetermined protocol and sign form reports supporting State Farm's decision to deny claims.

129.    State Farm pays these IME doctors exorbitant amounts to incentivize them to knowingly participate in the scheme.

130.    The Michigan No-Fault Act requires that insurers, including State Farm, timely pay all reasonable claims for reimbursement or payment for medically necessary treatments rendered to its insureds.

131.    State Farm uses its IME co-conspirators to unlawfully deny or delay payment of

claims in violation of the Act.

132.    State Farm uses the form reports and opinions signed by its IME co-conspirators (Exhibits F and G) to justify its decision to deny certain claims submitted by Summit as described herein.

133.    Summit has suffered and continues to suffer monetary damages as a direct and proximate result of State Farm's scheme using its IME co-conspirators to wrongfully and unlawfully deny claims submitted by Summit.

## COUNT III – DECLARATORY RELIEF

134.    Counter-Plaintiff Summit incorporates herein by reference each and every paragraph above as though fully set forth herein.

135.    Pursuant to MCL § 500.2006 of the Michigan Unfair Trade Practices Act, a person must pay on a timely basis to its insureds, to an individual or entity directly entitled to benefits under its insured's contract of insurance, or to a third-party tort claimant, the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third-party tort claimant 12% interest, as provided in MCL § 500.2006(4) on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in MCL § 500.2006(4) is an unfair trade practice unless the claim is reasonably in dispute.

136.    The requests for payment by Summit to State Farm are not reasonably in dispute.

137.    Pursuant to MCL § 500.2014(b), unfair methods of competition and unfair or deceptive acts or practices in the business of insurance include making a false entry of material fact in a book, report, or statement of a person engaged in the business of insurance or omitting to make a true entry of a material fact pertaining to the business of the person in a book, report, or statement of the person.

138.     Pursuant to MCL § 500.2020, it is an unfair method of competition and an unfair and deceptive act or practice in the business of insurance to make or permit any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, membership or policy fees, or rates charged for any policy or contract of accident or health insurance applicable to individual or family expense coverage or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.

139.     Pursuant to MCL § 500.2026(1), unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, other than isolated incidents, are a course of conduct indicating a persistent tendency to engage in that type of conduct, and include:

> a)  Misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue:
>
> b)  Failing to acknowledge promptly or to act reasonably and promptly upon communications with respect to claims arising under insurance policies;
>
> c)  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> d)  Refusing to pay claims without conducting a reasonable investigation based upon available information;
>
> e)  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
>
> f)  Failing to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;
>
> *     *     *
>
> l)  Delaying the investigation or payment of claims by requiring an insured,

claimant, or the physician of either to submit a preliminary claim report and then requiring subsequent submission of formal proof of loss forms, seeking solely the duplication of a verification;

n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromised settlement.

140.   Pursuant to MCL § 500.2064(1), no insurer, or any officer, director, agent or solicitor thereof shall issue, circulate or use or cause or permit to be issued, circulated, or used, any written or oral statement or circular misrepresenting the terms of any policy issued or to be issued by such insurer, or misrepresenting the benefits or privileges promised under any such policy.

141.   State Farm violated the statutory provisions set forth above, and each and every one of them.

142.   Pursuant to MCL § 500.2118(1), as a condition of maintaining its certificate of authority, an insurer shall not refuse to insure, refuse to continue to insure, or limit coverage available to an eligible person for automobile insurance, except in accordance with underwriting rules established pursuant to that section and MCL §§ 500.2119 and 500.2120.

143.   There is no basis under MCL §§ 500.2118, 500.2119 or 500.2120 for State Farm to limit the payment of medical expense PIP benefits in the fashion that it has with regard to Summit.

144.   State Farm's illegal, wrongful, grossly negligent, bad faith and malicious in fact actions as described above demonstrate a complete disregard for its obligations as an insurer pursuant to statutory provisions set forth herein.

145.   This Court should declare the actions of State Farm as referenced above, undertaken pursuant to authority under Ruth Johnson, Michigan Secretary of State, in regard to their actions

in furtherance of claims assigned through the Assigned Claims Facility, and undertaken pursuant to the authority authorized by Kevin Clinton, Michigan Commissioner of Insurance, to be illegal, unconstitutional, grossly negligent, in bad faith and malicious in fact, and further order either Kevin Clinton, Michigan Commissioner of Insurance, to suspend, revoke, or limit the authority of State Farm, or, in the alternative, order both Ruth Johnson, Michigan Secretary of State, and Kevin Clinton, Michigan Commissioner of Insurance, to order State Farm to cease and desist their illegal, unconstitutional, wrongful, grossly negligent, in bad faith and malicious in fact actions toward Summit.

## JURY TRIAL DEMAND

Counter-Plaintiff Summit hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff Summit request relief as follows:

A. Entry of an award of damages against State Farm and in favor of Counter-Plaintiff Summit in amounts to which Summit is found to be entitled;

B. Entry of an award of exemplary/punitive damages against State Farm and in favor of Summit in amounts to which they are found to be entitled;

C. Entry of relief pursuant to MCL § 500.2006; and

D. Entry of an award of such other and further relief as the Court deems just and proper in the circumstances.

*Respectfully submitted,*

JOELSON ROSENBERG PLC

/s/ Peter W. Joelson
Peter W. Joelson (P51468)
pjoelson@joelsonrosenberg.com
David W. Warren (P32449)
dwwarren@joelsonrosenberg.com

Emily Warren (P76675)
ewarren@jrlawplc.com
*Co-Attorneys for Defendants/Counter-Plaintiff*
*Summit Medical Group PLLC and David*
*Jankowski, D.O*
30665 Northwestern Hwy., Ste 200
Farmington Hills, MI  48334
(248) 626-9966  fax:  (248) 855-9496


LAW OFFICES OF GARY R. BLUMBERG PC

/s/ Gary R. Blumberg
Gary R. Blumberg (P29820)
grblumberg@gmail.com
*Co-Attorneys for Defendants/Counter-Plaintiff*
*Summit Medical Group PLLC and David Jankowski,*
*D.O*
15011 Michigan Ave.
Dearborn, MI 48126
(313) 230-1121

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document along with a Certificate of Service was electronically filed on October 29, 2015, with the Court's e-filing system, which will send notification of such filing to all attorneys of record.

<u>/s/ Emily Warren</u>
Emily Warren

**INDEX OF EXHIBITS**

Exhibit A:      Jury Verdict Form in Case No. 2012-016021-NF
Exhibit B:      Order Regarding Motions in Case No. 2012-016021-NF
Exhibit C:      Explanation of Review for unpaid bill for patient MF
Exhibit D:      "Investigation Letters" for patient RD
Exhibit E:      "EOBs" for patient RD
Exhibit F:      October 25, 2010 Report from Dr. Geiringer for patient RD
Exhibit G:      October 27, 2010 Report from Dr. Geiringer for patient RD
Exhibit H:      Denial Letter for patient RD, January 21, 2011
Exhibit I:      Letter to Evaluations Plus/Dr. Geiringer